UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) ) ) ) |
| v. | ) ) Criminal No. 23-cr-10053-DJC |
| REY DAVID FULCAR, | ) ) ) |
| Defendants. | ) ) ) ) ) |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                   **August 10, 2023**

**I.      Introduction**

Rey David Fulcar ("Fulcar") has moved to suppress the fruits of a search of his residence at 126 Main Street, Apartment 2, in Quincy (the "Residence") on July 23, 2022. D. 39. Having considered the motion and supporting memorandum, id., the government's opposition, D. 40, Fulcar's reply, D. 47, and the exhibits to same as well as the oral argument held on August 9, 2023, D. 49, the Court DENIES the motion.

**II.     Factual Background**

The following summary is based upon the affidavit of Detective James A. Peters of the Braintree Police Department in support of the July 23, 2022 search warrant for the Residence. D. 39-1.

In July 2022, officers with the Boston Police Department and Braintree Police Department received reliable information that Fulcar would be either the victim, or the perpetrator, of violence. D. 39-1 ¶ 10. After consulting various databases, officers determined that Fulcar was possibly

residing at the Residence and that a gray 2007 BMW 328XI (the "BMW") was registered in his name. Id.

On July 23, 2022, officers from the Boston Police Department began conducting surveillance of the Residence. Id. ¶ 11. At approximately 1:28 p.m., officers found the BMW parked in the rear of the multi-family building at that address. Id. ¶¶ 11, 17. At approximately 3:39 p.m., officers observed the BMW exit the parking lot at the Residence. Id. ¶ 11. They followed the vehicle to 15 Stacey Street in Randolph, an area where police had previously observed drug transactions. Id. ¶ 11. The BMW remained at Stacey Street from roughly 3:48 p.m. to 3:54 p.m. and then headed toward Boston. Id. ¶¶ 12, 14. Once in Boston, the BMW parked at 52 Hemmingway Street in Boston and a male, subsequently identified as Donald Cullen, entered the front passenger seat. Id. Cullen exited the vehicle about five seconds later. Id.

Officers followed Cullen and stopped him near Hemmingway Street. Id. ¶¶ 12–13. Cullen told officers that he had purchased three bags of crack cocaine from the operator of the BMW, who he knew only as "Jerry." Id. ¶ 13. Officers related the information to two Boston Police detectives who were still following the BMW. Id. ¶ 14. The detectives stopped the BMW at Calumet and Tremont Street, driven by Fulcar, and placed him under arrest for the distribution of a Class B controlled substance. Id. During Fulcar's booking, officers searched his person and found a bag in his underwear containing nine small bags (5.6 grams) of crack cocaine, two small bags (2.6 grams) of fentanyl, and two small bags (3.3 grams) of cocaine. Id. Officers also searched the BMW and found five bags of marijuana weighing a total of 200 grams and $1,141 in cash. Id.

Following Fulcar's arrest, officers went to the Residence and spoke with Mercedes Douglas. Id. ¶ 15. Douglas informed them that Fulcar was her boyfriend and that the couple had lived at the Residence for about a year and they had just renewed their lease there. Id.

2

Detective Peters then applied for a search warrant of the Residence, explaining that "probable cause exists" that Fulcar "is in the business of selling [f]entanyl, crack cocaine, and cocaine and that he resides at [the Residence]" Id. ¶ 16; D. 40-2.  In addition, Peters set forth his training and experience, which included, *inter alia*, assignments in a drug investigations unit of the Braintree Police Department and a task force with the Drug Enforcement Administration, D. 39-1 ¶ 1, and participation in more than one thousand drug investigations, id. ¶¶ 2–3.  He also noted his familiarity with "drug-law violators' methods of operation, including distribution, storage, and transportation of drugs and the collection of currency that constitutes the proceeds of drug activities."  Id. ¶ 3.  Peters further outlined the general structure of drug trafficking organizations, describing in relevant part "street dealers" as "persons who sell controlled substances to the consumers of controlled substances." Id. ¶ 5.C.  Such persons, according to Peters, "maintain relatively small inventories of controlled substances for retail sale, and sell controlled substances to consumers in relatively small quantities" and "confine their sales activities to small, defined geographical areas."  Id.  Significantly, Peters also attested to his knowledge of Fulcar's criminal history, including an open distribution of class B (cocaine) subsequent offense charge, a conviction for trafficking class B (cocaine) over 28 grams (2006), a conviction for possession with intent to distribute class A (2005) and other convictions, surveillance of Fulcar that day, as summarized above, his drug sale to Cullen shortly after leaving the Residence and the seizure of fentanyl, crack cocaine and cocaine from Fulcar's person after his arrest for the same and the five bags of marijuana and substantial amount of cash found in the BMW he was driving.  Id. ¶¶ 8, 11–14.

A magistrate judge approved Peters' application for a search warrant on the same day and officers executed it on the Residence.  D. 40-2; D. 40-3.  There, officers found a semi-automatic

firearm, seven rounds of ammunition, 2.6 grams of cocaine, 38.6 grams of suspected crack cocaine, a large plastic bag containing 41 grams of fentanyl, a small plastic bag containing 3.5 grams of fentanyl, .2 grams of crack cocaine, 56 suboxone strips, and a drug ledger. D. 40-3. On March 1, 2023, a federal grand jury returned an indictment charging Fulcar with one count of felon in possession of firearm and ammunition in violation of 18 U.S.C. § 922(g)(1) and two counts of possession of controlled substances (fentanyl and cocaine) with intent to distribute in violation of 21 U.S.C. § 841(a)(1). D. 1. Fulcar has moved to suppress the fruits of the search of the Residence. D. 39. The Court heard arguments from the parties on August 9, 2023 and took the matter under advisement. D. 49.

**III. Discussion**

Fulcar argues that the fruits of the search of the Residence should be suppressed because the search warrant was not supported by probable cause. D. 39 at 5–14. Conceding that that the "commission" element of probable cause has been satisfied, id. at 7, Fulcar focuses only on the nexus requirement, id. at 7–9. Fulcar also contends that the good faith exception to the exclusionary rule, see United States v. Leon, 468 U.S. 897, 922 (1984), does not apply because a reasonably trained officer would have understood the search was illegal. D. 39 at 14–18.

**A.  A Nexus Was Established for the Search Warrant of the Residence**

The presence of probable cause is an issue that can only be determined by "assessing the information provided in the four corners of the affidavit supporting the warrant application." United States v. Vigeant, 176 F.3d 565, 569 (1st Cir. 1999) (citing United States v. Khounsavanh, 113 F.3d 279, 283 & n.1 (1st Cir. 1997)). A warrant application "must demonstrate probable cause to believe that: 1) a crime has been committed; and 2) enumerated evidence of the offense will be found at the place to be searched—the so called 'nexus' requirement.'" United States v. Hicks,

575 F.3d 130, 136 (1st Cir. 2009) (internal citation omitted).  This means that there must be a "fair probability that contraband or evidence of a crime will be found in a particular place." Id.  The nexus between enumerated evidence of the crime and the place to be searched "can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]." United States v. Ribeiro, 397 F.3d 43, 49 (1st Cir. 2005) (internal citation and quotation marks omitted).  "In reviewing the affidavit support an application for a search warrant, we give significant deference to the magistrate judge's initial evaluation, reversing only if we see no 'substantial basis' for concluding that probable cause existed." Id. at 48 (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)).

There is no "per se rule automatically permitting the search of a defendant's home when he has engaged in drug activity." United States v. Roman, 942 F.3d 43, 51 (1st Cir. 2019).  The First Circuit has explained that "general observations from police officers that drug dealers tend to store evidence in their homes" must be coupled with "'specific observations,' or facts 'connecting the drug dealing to the home' to permit an inference of nexus to a defendant's residence." Id. at 52 (quoting Ribeiro, 397 F.3d at 50–51 and United States v. Bain, 874 F.3d 1, 23–24 (1st Cir. 2017)).  Pertinent, but not exhaustive, examples of specific observations include evidence that the drug distribution was organized from the defendant's residence, that the residence was used as a communications hub for drug activity, or that the defendant moved back and forth from his residence in relation to drug transactions. Id.

Here, the Peters affidavit submitted in support of the warrant application establishes a sufficient nexus between Fulcar's drug dealing, including the drug sale he made to Cullen on the very same day that the search was sought, and the Residence.  While surveilling the Residence,

officers observed that a BMW registered to Fulcar was parked behind the multi-family dwelling there. They further observed the BMW exit the parking lot and within ten minutes park on Stacey Street in Randolph, an area where officers had "observed drug transactions . . . in the past" and where, according to "recently received information from patrol officers[,] . . . drug sales [were] being conducted." D. 39-1 ¶ 11. Shortly thereafter, investigators then observed the BMW, driven by Fulcar, stop in Boston and have a brief meeting with Cullen. Stopping Cullen right after that observation, the officers determined that Fulcar had sold Cullen crack cocaine. Investigators then stopped the BMW. Arresting Fulcar for the sale to Cullen, officers discovered that he still had nine, small baggies of crack cocaine, two small bags of fentanyl and two small bags of cocaine, all packaged for sale, and five bags of marijuana and $1,141 in cash. These specific observations reasonably support the inference that the Residence that he had left shortly before his sale to Cullen and his arrest would contain drugs and other evidence of drug dealing.

Relying heavily on Roman, 942 F.3d at 43, Fulcar argues that the government has not established the requisite nexus with the Residence. Neither Roman nor other First Circuit precedent warrants this conclusion. In Roman, the First Circuit affirmed a district court's decision suppressing the fruits of the search of Roman's residence, reasoning that the warrant application did not establish a connection between Roman's drug dealing activity and his residence. Id. at 51. Surveillance agents had observed Roman park his car at a local business and carry a "weighted bag" into the store. Id. at 51. The affidavit submitted in support of the agents' warrant application did not indicate whether this car was the same "blue colored Acura SUV" that agents had seen parked at Roman's residence, "[n]or d[id] it allege that Roman had driven the car to or from his residence on the day he carried the weighed bag, a factor we have previously found supports an inference of nexus." Id.

By contrast, Detective Peters' affidavit sets forth specific observations by officers connecting Fulcar to the Residence, namely that the BMW parked at the Residence was the same vehicle that initially stopped on Stacey Street and was then involved in the subsequent drug transaction will Cullen, that the BMW was registered to Fulcar and, further, that these specific observations were made "on the day" Fulcar had left what officers confirmed to be his residence. See id.  Even considering Roman, this case falls squarely within the settled precedent of this circuit which recognizes a nexus to a defendant's residence after that defendant engages in drug dealing activity shortly after leaving said residence. See United States v. Barnes, 492 F.3d 33, 37 (1st Cir. 2007) (noting in rejecting the defendant's lack of nexus argument that "[t]his court has repeatedly found, however, that when a defendant sells drugs outside his home, it is reasonable to conclude that there is evidence of his drug dealing activity in the home, particularly when the defendant is observed leaving the home immediately prior to selling drugs"); see also United States v. Dessesaure, 429 F.3d 359, 368–69 (1st Cir. 2005) (noting a nexus to the residence where defendant sold drugs to someone from his car and where defendant "had just come from his apartment, making it likely that the drugs he sold . . . came from the apartment"); United States v. Feliz, 182 F.3d 82, 86–88 (1st Cir. 1999) (holding that probable cause existed to search home where police only observed a defendant selling drugs out of his car because the residence was "a likely place to seek to find incriminating items").

For example, in Barnes, 492 F.3d at 37 , the First Circuit rejected Barnes' nexus claim "that there was no probable cause that evidence of [his] drug dealing would be found" at the residence where, according to a confidential informant, Barnes lived.  Barnes insisted that although officers had monitored drug sales from his Cadillac Escalade, the car was registered to a different address than the residence and that police had only observed him leave the residence, not occupy it.  Id. at

37. The First Circuit held that a nexus had been established, reasoning that a confidential informant had said that Barnes lived at the residence and that police observed Barnes leave the residence, "drive away, and sell drugs on the day of his arrest and the search." Id.

Fulcar has suggested that there are no cases that exactly address the factual scenario here. Even assuming that is correct, that may very well be because the evidence of nexus here is substantial. That is, the police observed all of the following in real time: Fulcar leaving the Residence in his vehicle; Fulcar then driving, after a brief stop on Stacey Street, to meet Cullen for a short meeting; stopping Cullen right after that meeting and determining that Fulcar had sold him crack cocaine; stopping Fulcar soon after that and finding multiple drugs, all packaged for sale, on him; and then seeking and executing a search warrant on the Residence the same day that the surveillance of Fulcar at the Residence began. That Fulcar stopped on Stacey Street in Randolph before selling crack cocaine to Cullen does not negate the nexus to the Residence. There is no factual support for the defense theory that Fulcar visited a stash house here. As the Peters affidavit attested, he had received information from a Randolph Police detective who had observed drug transactions on this street in the past and had received recent information that "drug sales [were] being conducted" on this street. D. 39-1 ¶ 11. This information, viewed in the light of Fulcar's movements and his concealment of multiple quantities of sale-ready drugs on his person and the large quantity of cash in his BMW that day, is more consistent with the notion that he stopped on Stacey Street to make a drug sale to another customer before meeting Cullen. Even assuming *arguendo* that Stacey Street was a stash location for Fulcar, however, still would not negate the nexus for the Residence, particularly where officers observed him leave the Residence shortly before the Cullen sale and there was no other residence associated with him, see Feliz, 182 F.3d at 88, and it is reasonable inference that Fulcar made some of the arrangements by phone to

meet Cullen for the crack cocaine sale from the Residence, see D. 39-1 ¶ 13 (noting that Cullen provided the phone number that he used to order crack cocaine from Fulcar), and that Fulcar secreted the multiple baggies of crack cocaine, fentanyl and cocaine in his underwear in a place of privacy (i.e., the Residence) before driving in his vehicle to conduct drug transactions.

Because both the commission requirement and the nexus requirement are met here, the issuance of the search warrant for the Residence was proper and the Court DENIES the motion to suppress the fruits of that search.

### B.  Alternatively, the Leon Good Faith Exception Applies

Even assuming *arguendo* that the search warrant was somehow defective, the good faith exception under Leon, 468 U.S. at 926 would apply and suppression of the fruits of the search of the Residence would not be warranted.

As well established, the suppression of evidence seized without probable cause is not warranted "where an objectively reasonable law enforcement officer relied in good faith on a defective warrant because suppression in that instance would serve no deterrent purpose." United States v. Syphers, 426 F.3d 461, 467 (1st Cir. 2005) (internal citation and quotation marks omitted); see United States v. Pimentel, 26 F.4th 86, 90 (1st Cir. 2022).  In the absence of any allegation that the magistrate judge was misled by information that the affiant provided that was false or that he would have known to be false but for his reckless disregard for truth, that the magistrate judge abandoned his detached and neutral role in issuance, that the affidavit was so lacking in indicia of probable cause that reliance upon it was unreasonable or that the warrant was so facially deficient that the agents could not have reasonably concluded that it was valid, the exception applies.  Leon, 468 U.S. at 926; United States v. Owens, 167 F.3d 739, 745 (1st Cir. 1999).

Here, Fulcar contends that the search warrant was so lacking in probable cause that the officers' reliance upon it was unreasonable and, therefore, the Leon good faith exception should not apply. For all of the reasons that the Court has discussed as to the nexus element, the Court disagrees with Fulcar's contention. Although the search warrant affidavit was not a model of persuasion, it cannot be characterized as a "bare bones" affidavit where it attested to the facts that amply supported probable cause to believe that Fulcar had committed crimes (namely, drug distribution and possession with intent to distribute drugs) and that evidence of same would be found at the Residence. Accordingly, the affidavit was not lacking in indicia of probable cause and it was reasonable for the agents to rely upon it and the search warrant that was issued.

## IV.     Conclusion

For the foregoing reasons, the Court DENIES Fulcar's motion to suppress, D. 39.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge